The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons who have any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw not and give their attention, for the Court is now sitting. God save the United States and its Honorable Court. Be seated. I want to welcome everyone this afternoon to the Fourth Circuit Court of Appeals. It's good to have you here. We've got a case here involving Mr. Kingsborough, United States v. James Kingsborough from the Good afternoon, Your Honors. If it pleases this Court, William Perporin, Court-Appointed Counsel, in behalf of James Kingsborough. Your Honors, if I may, I'm going to start right with the very first issue, whether the police had reasonable, articulable suspicion to stop and seize Mr. Kingsborough or whether it was, in fact, a mere hunch. And that takes us very quickly to June 17, 2015, broad daylight, 12 o'clock in the noon, two police officers in Baltimore leaving a 7-Eleven with their coffee and donuts. They see a young African-American man bent over, perhaps fumbling around with the front area of his pants, and at that point they go over to see if he has a medical I'm not making any type of a race-based claim here. I'm not. I'm not. But I think it's important in context. And I think if I'm When do you think the stop occurred? When did the stop occur? It's hard to tell based on the Good question. Changes in the testimony. The actual seizure itself, where the Fourth Amendment comes in, would be in the barbershop when the officer, in my opinion, and I believe in Judge Mott's opinion, and I believe in when he goes to grab Mr. Kingsborough. Outside the barbershop? Inside the barbershop. Inside the barbershop. As Mr. Kingsborough is walking towards the police officer at that time. And Judge Agee, if I may answer your question, I'm making a race-based claim here, but as far as the high crime area factor that the Court must consider, in Baltimore, as in many of our cities, there is a disproportionate amount of African-American people that live in that area by force of circumstance. So one of the criteria, supposedly, for a Terry stop is that it's a high crime area. And unfortunately, by birth and or economic circumstance, that's where this particular person lives. And that's really what the Fourth Amendment should be guided to protect, those people where there is excessive police force. Your degree in Baltimore now covers these types of Fourth Amendment issues, correct? It does. It does. Yes, it does. Yes, it does. Yes. And so, if I may, so you have this . . . You didn't represent him at this under . . . No. . . . in the district court. I didn't. He was well represented by an ex-Federal Defender. You probably had him before you, Joseph Balter. And this was his first practice outside of about 30 years as being a Deputy Federal Defender in our district. This was his first case. He was a Deputy Defender and then he went out in private practice. That's correct, sir. And then he was appointed to represent this fellow. He was. And then you were appointed on the appeal. I came in on the sentencing. Pardon? Well, I came in for the sentencing. You were there sentencing as well? Yes. So, you were in part of it in the district court? Just for the sentencing and then the appeal. But not with regard to the suppression . . . That's correct. . . . effort. That's correct, sir. . . . or the trial. That's absolutely correct. Okay. All right. Got it. And what they saw at that point was this young man bent over. He's wearing shorts. I think that's important. And a T-shirt. And they can't see where his hands are at that time. They go to render the police officers medical, and they're in a marked police car, medical aid. They think they're going to ask him, do you have a medical problem? And they ask him that question. His response was no. And then he went on to say, which the government feels is significant, that I'm on the box. The box meaning . . . A four-lane highway or a two-lane highway? This is a Baltimore street with two lanes on one side and two lanes on the other side. Four lanes. Yes, sir. In West Virginia, we'd call it a four-lane highway. We'd call it a four-lane highway. But I'm just trying to get the picture up. The picture would be that not all lanes can be used because there's parking on the right-hand side lanes. So this is an inner city area with the 7-Elevens on the corner. And this young man is just on the street corner, bent over at that particular time. And I turned around and followed him. He walked away. At that point, he walked away. I'll get back to where he's . . . they ask him if he's all right. Yes, sir. And he said, I'm on the box. Nope. The first response was he asked him if he's all right, something to that degree. And his response was okay. And he said, I'm okay. Okay. And then he went right on to say, I'm on the box, meaning that he's on electronic monitoring, meaning a bracelet which is on his right ankle which is exposed because he's wearing shorts on. Which means he's under court supervision. Correct. Or sentence. Correct. Correct. And that's what the record shows. It was that he . . . it shows that he . . . I'm not sure that came out as part of the motion itself. But it's in there that he was clearly under . . . It's on page 60. Yes, sir. He was clearly . . . Yes. Yes. Yes. And . . . Okay. And the sentence would have to be that he's already been convicted of something. And he's on the box. I mean, that's what . . . that was a question asked by your predecessor lawyer, I'm referring to. That is the language he used to the police officer. Right. Well, I can tell you this much, that perhaps retroactive . . . At the beginning of the hearing, he said, what's this on the box mean? And I was looking to it . . . that's how I found this on this page 60. I was interested in what it meant, too. And I was a prosecutor for a long time, just like Judge Moss. Because we didn't have them back then, I guess. Maybe that's the reason we didn't understand it. But he asked about what was on the box. And nobody . . . that wasn't mentioned that way in the response. And I don't know whether it was your predecessor or the government lawyer. But somebody undertook to explain it to Judge Moss. But this . . . on page 60, when the police officer was there, it says, supervision, enforcement monitoring, law enforcement monitoring, or sentence. Yeah. Something like that. And a sentence pretty much means that he's been convicted of something. Been convicted of something. And then you . . . and they saw it because he had his . . . he was wearing shorts. And they could see this thing on his ankle. The box was on his ankle. That was not used as a factor either by Judge Moss. It wasn't used. I didn't say it was a factor that Judge Moss found as a reason for the stop itself. But I'm talking about what the facts are. Yeah. Not what the government's argued or what Judge Moss said. I'm just looking at what the facts are. I'm with you. And the first time they ran into the police officers, he said, I'm on the box. And so at the hearing, there was questions about what that means. And what does it mean? What does it still mean? You said it doesn't mean a sentence? In retrospect, I wish it was fleshed out more. And I'm sorry that Mr. Bolter didn't flesh it out and bring it out. We just got to deal with the cards we got. The testimony says law enforcement monitoring or supervision or sentence. But we don't know what type. That could have been a misdemeanor. It could have been anything. It was something that he was under court supervision before. And that's what this says. And we got law here in a lot of these cases that say in these suppression things, we look at, we take facts in the light most favorable to the government. Right. Unfortunately for you, I think, that's what the law is in this circuit. Light most favorable to the government. At that point, most favorable to the government, I suspect, is sentence. Now, the government, for some reason, doesn't want to emphasize that, but that's what it looks to me like. And a sentence means, could be a misdemeanor. Could be a felony sentence. But it's a sentence. And most favorable to the government probably is it's a felony sentence. He's on the box. I don't know. What is this for? But we just take the cards we got. I think if you take the cards you got and you look at them, the response by the defendant in this particular case was he told the police officers, I'm on the box. He wanted to bring it to their attention so when they looked at it, that he was not trying to hide anything from them. He was bending over. They thought he was sick or hurt. Correct. Or something. That's what they said anyway. Right. And what he was most concerned was that he didn't want the police to get the wrong impression that he was evading. He was cooperative and not evasive. That's correct. By giving them that information when they didn't even ask about it. And did they ever use that other to say it was a weird response, the fact that he was on the box? No. In any way for their suspicions? No, they did not. They did not. And I'll just go very quickly. What they did say is when he. Have they waived it then? Have they waived the right to argue that this on the box means something in the context of reasonable suspicion or probable cause? I don't see what it means at all. I don't think that we have a lot of people. You mentioned on page three of your brief that your client was under judicially mandated supervision. Yes. Can you think of any circumstance, either in the federal system or a state system, where someone who's on judicially mandated supervision is permitted to possess a weapon? I would agree. They cannot. Wouldn't that be a relevant factor in the context of all the events that happened for a trained police officer to consider? If he. The issue is what other. Perhaps that's one factor that no one's really mentioned until this court has. And I understand the court's reasoning for that. But with all the other factors, there's really nothing else. There's a lot of people who are, in quotes, on the box that are walking around unsupervised release, either in state and or the federal system itself. And they see that coupled with the fact that he brought it out himself. They didn't have to ask him about it. And that's in his favor. And the police never asked him, what are you on the box for? They didn't follow up whatsoever. But if he's under supervision of a court. Right. Then it's more. And if he has a gun in his waistband, is he a walking felony? If this young man had a gun, period, he was a walking felony. Well, because he didn't cause it. No, but they didn't know he had a felony conviction. That's correct. Specifically, they knew he was under some kind of supervision of a court. Right. That's correct. And it may be a sentence. But maybe it wasn't. But anyway. But if he if he is under judicial supervision and if he has a gun, which one of the officers said when he was out in the middle of the street, before he went into the barbershop at that point. Didn't that give him reasonable suspicion? They didn't or probable cause. They didn't see the gun. The gun. They never saw the gun. They never saw the gun. But one of the officers, when he straightened up, then he tucked in his waistband. Right. One of the officers turned to the other. Correct. And cussed and said, he's got a gun. That's correct. That's because he had his right hand. He thought in his in his waist area, his left hand was hanging loose. But that same officer also said it's not unusual, especially in a city, for young men to be walking around with their hands down the front of their pants as they walk. And didn't that officer change his testimony several times? And also, his police report did not say that he saw his hands in his pants. And that's what Mr. Balter brought out on cross-examination, I think, multiple times. Isn't the police report in the record? It is not in the record. It's got to be somewhere. Sorry. I'm sorry. It's got to be somewhere. Judge Mott had it in the record. It wasn't at a trial? I don't. It wasn't 11 at the trial, I think. I believe the police report was used for cross-examination only, and therefore it's not admitted as an exhibit at that point. It was used to impeach the police officer so it doesn't come in as an exhibit. So we don't have the police report. But clearly from the police report. Did Judge Mott consider it as evidence, the police report? He had it available to him. Not the report itself. He considered – I can't tell you what Judge Mott said or didn't because it's not articulated, but I'm sure that he considered the fact that it's not in his report when he weighed the credibility of police officers, which gives me in 40 seconds just my last issue on the jury instruction by Judge Mott itself. And if I may, that under the unique circumstances of this particular case. Don't worry about the light. You get in questions, you keep answering. Thank you. I appreciate that. All right. Don't you worry about that. Thank you, sir. And I'll speak slower then. Under the unique circumstances of this particular case where the trial testimony was – the suppression testimony was literally the same testimony which was elicited at the trial itself. So we have the police officers testifying identically to all the information as to all the probable cause and everything else as to the gun itself. That the – Judge Mott's given the instruction that the court has determined that the searches in this case were valid and legal, and that was not – it's not a San Seaford instruction. It's an instruction the government requested on the issue of probable cause. What that does is he already indicates to the jury that he's found the officer's testimony, because he's heard it in a suppression motion, to be honest and to be truthful. So he's taken that question from the jury itself. We review this issue for plain error. Is that correct? No, that was objected to, yes. No, that was objected to by Joe Balter. He objected to the instruction, and I have the page number, Joint Exhibit 179. Okay. And the response from government counsel – There was error, but the legal principle wasn't wrong, was it? Well, what's wrong – Was error to give it under the circumstances? Very unique circumstances, yes, because the only issue in this case are the police in Baltimore City being truthful. So we reviewed that for abuse of discretion then? Well, it was objected to in the instructions. Correct, correct, yes. But given an instruction, it's normally reviewed for abuse of discretion. Yes. Even if it's objected to. Absolutely, I agree. I mean, Judge Mott said discretion on what kind of instructions to give. That's correct. And actually, Judge Mott – As long as they're legally correct. He can't give it legally wrongly. I think when the government introduced it, Judge Mott said – he equivocated in the transcript, and you'll see, I think his final response was, okay, it's on me. Give the instruction, but it's on me. And again, it's not a Sanson-Seaford instruction. It's not a forum instruction. It's an unusual instruction to give. And the problem in this particular case is that you're basically telling this jury that I've heard the testimony and I've already found them to be honest and truthful because there's not a suppression issue here. Which officer was it that said – at one point said, oh, he's got a gun? I think he said that at the suppression hearing. Was it that – the one that – not Santos, but the other one? It was. It was the – All right, that was at the suppression hearing. Yes. And he's the one who admitted that his police report was inaccurate, correct? Wasn't complete, correct. Didn't he testify at trial that he had no idea what he was looking at and didn't realize the appellant had a handgun until later on? That's correct. So he's got – He had multiple inconsistencies, which I think were brought out, and they were brought out in trial itself. You're saying it was inconsistencies. Did he ever repudiate the fact he had said to his buddy he's got a gun? He never repudiated that. That's correct. So it's uncontradicted that he said to his buddy he's got a gun. He did. He did. And again – And so – and this was within a minute or so of your client saying I'm on the box. And then he went out in the street. Right. They went up the street and turned around and came back and he was straightened up. Straightened up. And at that point the officer concluded he's got a gun. And he said to his friend. He's got a gun. But again, he says it based on everything which we just talked about before. He said he's got a gun, and all that was before he went into the barbershop. And at that point he was determined he was going to stop him. And if he was under judicial supervision – Right. And if he had a gun, then there was – and if the officers reasonably believed that, they would have probable cause to arrest him while he was standing out there in the middle of the street before he ever went in the barbershop. Judge King, I agree. The dog in the fight we have here is that we suggest that there was not articulable suspicion to even infer that he had a gun from the facts. I understand. Thank you. My time is up. And you're doing a good job. It's a pleasure. We're going to let the government explain to us here what they think about it. That's Mr. Medcalf.  Thank you, Your Honor. Thank you, Your Honor. May it please the Court, my name is David Medcalf. I'm an assistant United States attorney for the District of Maryland, and I'm representing APALE, the United States, in this matter. First, I'd like to clarify the on-the-box fact. I think that's something that's obviously something that's on the judge's mind. It refers to the electronic monitoring system that's on the defendant's ankle. It's a colloquial term for the actual device that's on the person's leg. That's what on-the-box means. And the officers testified that that did not give them any suspicion, didn't they? Didn't one of them say, it's not appellant status as a criminal probationer that necessarily drew suspicion, but rather his answer, I'm on the box, made no sense? That was my words in the brief, Judge Thacker. Oh, okay. That was you then. Yeah, that was me who said that. So that's not an argument the government has made before? Your Honor, I think it's a fact that the Court should consider. Have you ever made that argument before? We made it certainly in the court below in the brief. It's the opposite argument you might have made below. You said it's not the fact that he was a criminal probationer that necessarily drew suspicion. Yeah, necessarily, Your Honor. It's not just that. And to Judge Agee's point, the crime at issue is not possessing a firearm under supervision. The crime at issue— When did the stop occur? The stop occurred inside the barbershop after Officer Suckelseye, that's how you pronounce the name. What is it? Officer Suckelseye. Suckelseye. Suckelseye. Okay. Like honeysuckle and then zye. Okay. Yeah. Officer Suckelseye physically touched Mr. Kingsborough in the barbershop. That is the moment of seizure. What was his reasonable articulated suspicion of criminal activity at that point? So there's a whole host of facts, and I'll go through them one by one. First you have the awkward hunch over and grabbing of the waistband at the moment they saw Mr. Kingsborough. They then go and approach Mr. Kingsborough. Which they thought was he was injured. Yeah, they didn't necessarily jump to conclusions, Your Honor, and that's the point we like to make in the brief in terms of officers who are trained to detect and identify armed characteristics. This is not a situation where we're asking the court to rule that anytime someone grabs their waistband that it's automatic reasonable suspicion. Just in a high-crime area. No, and that's not what we're saying either. It's a contextual inquiry, Your Honor, and what they did is they went and approached him and they asked Mr. Kingsborough if he was okay, and he said, yeah, I'm on the box. And the point we're trying to make with He said, I'm okay, then he said, I'm on the box. He said, yeah, I'm on the box. That was the exact quote in the joint appendix. And the significance of that is it's just a non-responsive strange answer. It's a responsive and direct answer, a cooperative answer, and a non-invasive answer when he's wearing shorts and he knows he's on the box and police officers approach him. If he had not said that, then they would have said something was strange. He said it's something strange. He hunched over something strange. He then stands up something strange. He walks away something strange. What could he do? Your Honor, I think the fact that he's holding his torso, that's where they thought he was injured, and the fact that the monitoring device was on the ankle, that's why they considered it strange. They thought if he said, I'm on the box, it would be some sort of explanation for why he was holding his waistband. That was the particular thing they were trying to figure out. That was the particular aspect they were trying to investigate is why he was holding his waistband. And when he said, yeah, I'm on the box, that's why it seems strange. It's not just the fact that he said he was a probationer, and that's the point we're trying to make in the brief. It's not necessarily the fact. I still don't understand why it's strange that he fully responded to them. If I was holding my stomach and you were to ask if I'm okay and I referred to my ankle, that would be a strange answer. You're not a probationer in a high-crime area being approached by police officers with shorts on and the monitor obviously showing. Your Honor, I don't think that's – I think if you were in that position, you would want to be as forthcoming as you could with those officers, which he did. I'm not disputing that he was cooperative. I don't think that's what's at issue here, Your Honor. I think it's just that he was giving a nonresponsive answer. And I don't want to get too harped up on this because, again, it's a whole series of facts and it's a holistic inquiry. You'll notice they didn't detain him there. What was the question? What did they ask him? They said, are you okay? And he said. Yeah, I'm on the box. Okay. Is yeah nonresponsive? Yeah is responsive. I'm on the box is a strange answer. And I don't want to emphasize it too much, Judge Stackert. Yeah, we probably should move on. There are other facts. Because afterwards, they didn't detain him there. That's not the reason why we're here today. That's not the reason why they arrested him. It was a circumstantial inquiry. Afterwards, they observed him walk away and they observed him continue to hold his waistband, walk through the middle of the intersection, and in the middle of the intersection, reaching to his waistband with his right hand, appeared to adjust an object, and then with a stiff arm. Where does it say he reached into his waistband? I thought that was the part that the police report did not include. The police report did not include that. Right. Why do you keep saying it if the police report didn't include it? Because Officer Sucklesack testified as much in the hearing, Your Honor. Right. I know. He testified to a lot of different things. How come you didn't put the police report in the record? Why didn't you put the police report in the record? Your Honor, I don't think that's what the issue on this appeal is. Are you referring to the record on appeal or the record in appeal? I'm talking about the record at the suppression hearing. Your Honor, at the suppression hearing? Yes. Your Honor, I was not the AUSA for the suppression hearing. That doesn't make a bit of difference. You're the only one we got here. Why wasn't the officer's statement put in the record at the suppression hearing? Was that neglect or detentional? It was probably neglect, Your Honor. Obviously, as Mr. Perpura pointed out, his predecessor cross-examined Officer Sucklesack long and hard about that discrepancy, Judge Thacker, about the fact that it wasn't listed in the police report and that he testified at the hearing that he did see Mr. Kingsborough appear to reach into his waistband and adjust an object. After that, he then took his arm and braced with a stiff arm against his waist. These officers are trained and experienced to detect firearm possession. They know what that means. When did he tell the other officer, oh, shit, he's got a gun? Right after that moment, when he was in the middle of the intersection and he saw him reach into his waistband and appear to adjust to an object. That's when the light flicked on, so to speak. They didn't stop him then. They didn't. They followed him. But as of that point, could they have stopped him? Our opinion is yes, they could have, although that's not all the facts we have in this case. But as of that point, you're saying as of that point, they could have stopped him? Yes, at that point, they have reasonable suspicion. How could they have stopped him then just for having a gun? Because unlike West Virginia and Virginia, you are not allowed to carry a firearm in public in Maryland, and that's what distinguishes this case from the decision you were a part of, Judge Thacker. Not entitled where? In the state of Maryland, you cannot carry a firearm in public. You're not allowed to. But he has it in his waistband. You are not allowed to carry it on your waistband. He didn't see the gun. He came to the conclusion, based on his experience and all that, and what he'd seen there, altogether, he thought he had a gun. Correct. He had reasonable suspicion that Mr. King... He formed an opinion or something that he had a gun, and he verbalized it on this record. Your Honor, I would qualify it as reasonable suspicion as opposed to a hunch. It wasn't a hunch. Well, I... If he had a gun, if the officer thought he had a gun and formed an opinion he had a gun, and if he's under sentence, which is judicial supervision and wasn't supposed to have a gun, I would be arguing, if I were you, that it was probable cause. We do argue that... Because it's the very thing you convicted him of. Being a convicted... Possession of a firearm while being a felon. Correct. That's what you prosecuted him for. And I don't know why the government's not arguing that he had probable cause when he was out there in the middle of the street to arrest him. Your Honor, whether he's a criminal probationer or whether he's out in the street, no one in Baltimore can have a gun. It's a crime. That's why we don't harp on that. Have you cited... I'm sorry, have you given us the citations for those authorities? We have not, Your Honor. I'm happy to submit a supplemental citation for what the Maryland criminal article is. It's a misdemeanor to carry a gun in Maryland. It's because that's not the criminal activity that the officers articulated at the time that they were suspicious of, is it? I disagree with that, Your Honor. There's a reasonable suspicion linked to what alleged criminal activity, and where in the record is that? It's the where carry transport statute in Maryland. You can't have a gun in Maryland. And where did the police officers talk about that? They didn't cite that in the record, I believe. Anywhere. So it doesn't appear in the hearing, that's what the... They didn't cite a particular statute of what crime they were investigating. They were investigating... Crime of being in a high-crime area. That's not the crime, Your Honor. Then what is it? They have to cite something, don't they? Have to link it to something then and not... Can they come up with it two years later? They cannot. The prosecutors at the suppression hearing argued that Mr. Kingsborough was in illegal possession of a firearm. Again, they didn't cite the particular statute. It's implied in the record. That's what they're investigating. They just had a hunch that something was up. I disagree, Your Honor. It was not a hunch. It was a reasonable suspicion that Mr. Kingsborough was in possession of a firearm. And, Judge King, whether it's your point, whether he's because he's on supervised release and he can't have a firearm or because he's out in public in Maryland. Then it really seems to me like, as Judge King was saying, they would have stopped him right then on the street rather than let him enter a public space when they thought he had a gun in a place that had been robbed a few weeks earlier. Why would they let him do that? Your Honor, I don't think they did let him. As soon as they found out he had a gun, they immediately tried to apprehend him. He was in the middle of the intersection. And to your point, that's actually why they entered... How far was he from the barbershop at that point? A couple dozen feet. I can't really sort of... Barbershop just across the street? Yeah, so it's on the southwest corner of the intersection, and the officers are on the northeast corner. And their car is turned around, so they have to make a U-turn, and then they drive up. And Mr. Kingsborough is walking swiftly with his left arm swinging freely and his right arm... If you review the officer's testimony... So there are two traffic lanes plus a sidewalk away from the barbershop? Correct, Your Honor. And then Mr. Kingsborough walks directly into the barbershop. The officers turn around and then follow him into the barbershop for the reason that you just described, Judge Thacker, which is that they were concerned that he was bringing a firearm into a public area. They said they'd heard or knew that the barbershop had been the subject of an armed robbery. Yes, that certainly was something that they... They thought that somebody they had just approached in a marked vehicle, and he had told them he was on the box and that was following him, they thought that he was going to go in there and rob the place? I don't think they said he was going to rob the place necessarily. I think they said that he was going into the barbershop with people around with a loaded firearm. That was the concern. I think they testified more than once about a concern of armed robbery at that place, days or weeks earlier. Your Honor, possibly they did. I don't recall if that's the... They did. They did several times. Apologies, Your Honor. Then it was that as well as the fact that he was going in there with a gun. It's not particularly what the concern is at that point. It's the fact that they have reasonable suspicion to detain Mr. Kingsborough. Was there evidence that as of the time the officer said, I think he's got a gun or he's got a gun, when he was in the middle of the street, is that when they informed the intent to stop him? You got it. It is. That's right. And they didn't execute it until he'd gotten... They couldn't get to him until he was in the barbershop. At the time, the first officer, what do you call him? Suckle Zai. Suckle Zai. Anyway, he's the one, he said he's got a gun. Yes. And that's when they decided they needed to stop him. Yes. So where did they testify to that? They testified in the suppression hearing and at trial that as soon as they went there, they immediately went to go get Mr.... As soon as they went where? The barbershop. The barbershop. As soon as they saw that, they tried to follow Mr. Kingsborough as he walked into the barbershop to arrest him. That was the idea behind going into the barbershop. And what if they don't articulate all this as well as you do? Does that cross up the government's case? Well, obviously Judge Thacker made a lot about... At one point here, you all seemed to argue that they could have stopped him for jaywalking. Your Honor, I think I overstated that principle in the brief. I think it's relevant to the... I think it's relevant to the analysis that he walked through the middle of the four-way highway, Your Honor. But it's really... The issue is... I don't think we want to get started, that kind of stuff. Correct. When I had to come to court today, I came across the street out here. Luckily, we're not in a high crime area. Anyway, at the time, he was in the middle of the street. You say he had reasonable suspicion and a basis for a stop. That's correct, Your Honor. That's not all the facts we have because there are further facts in the barbershop that added to the... And you say carrying a gun in Baltimore is a violation of state law. It absolutely is. And if he's a felon and carrying a gun in Baltimore, it's a violation of federal law. And if he's under supervision, it's a violation of... Which you prosecuted and convicted him of. Correct, Your Honor. If he's indicted in a state court in Baltimore, can he be carrying a gun? I'm sorry? If he'd been indicted. If you had charges appending against you and you're released on bond, can you have a gun? No, Your Honor, you cannot. Section 922D of the federal code and the state... You can't have a gun. You cannot have a gun. If you're under indictment. Correct, Your Honor. That's a federal crime and a state crime. It's a federal crime and a state crime. You cannot possess a gun while under supervised release. Okay. And that's the crime that you say the officers believed they had reasonable suspicion of at the time they stopped him? No, Your Honor, I think it was principally the Maryland state law that prevents anyone from possessing a firearm. That's the crime they stopped him for? Correct, Your Honor. And where did... Was that in the police report? That's what he was arrested for. It was a wear and carry transport. And that's in the police... No, I mean, is it in their testimony that the reason they stopped him was because of that statute? No, not that particular statutory section. What is the crime that they had reasonable... that they had in their mind when they developed this reasonable suspicion? It's that crime. They did not specifically cite it in the hearing by, you know, letter and word. You're saying there was a warrant, a complaint and a warrant for that crime? That's what he was charged with? Stateside, he was charged with wearing a firearm in public. Is that in the record here? I don't know if it's in the appellate record. Is the warrant in the record? I'm sorry? Is the warrant in the record, the arrest warrant? I don't... Once they tackled him there when he came out of the barbershop, they took him into custody. They had to get some paperwork, right? Correct, Your Honor. I do not believe it's a part of the appellate record. That paperwork's not in the record anywhere? I don't believe it is, Your Honor. Okay. And the police report wasn't in front of the district court? It was. I believe it was. Is it in the record at the suppression hearing? It's not... Or at this cross? I think it was in the record, both presented in the record in the trial testimony and in the suppression hearing. Mr. Bolter cross-examined the police officers about the police report. Was it in the record and just left out of the appendix? Or would the appendix and the record are two different things? Yeah, Mr. Perpero can possibly clarify whether it was in the suppression hearing record, Your Honor. You both have a responsibility for understanding what's in the record, I think. It's not in the appellate record, Your Honor, and I'm sorry if I'm confused. Well, if there was a hearing in front of Judge Motz in a trial, but particularly the hearing, whatever is in the record is in the record, whether it's in the appendix or not. Correct. And if it's not in the record, I mean, either one of you could move to supplement the record if you thought it was pertinent to what we have to do. And if the Court believes that we should, we'd be happy to do that. Appellate rule. We'd be happy to do that to clarify what exactly the basis for the arrest was. But I think it's clear from the testimony, Judge Thacker, that it was the law that was prohibits anyone from carrying a firearm in public that Mr. Kingsborough was arrested for when they effected the arrest. It's not clear to me. Well, we'd be happy to make it clear, Your Honor. I have two minutes left. I would just like to address the other issues on appeal. To your point, Judge King, the jury instruction is a correct statement of the law, and that's really all that matters. It was aimed to eliminate the objection. Now, Mr. Perpora says correctly, I think, that there was an objection to the instruction. Was the objection limited to, Judge, you shouldn't give this kind of an instruction, or was it an objection that says this instruction is wrong on the law? Your Honor, I think it was, Judge, you shouldn't give it a general instruction. That, to me, is enough to preserve it for this Court to review. I don't think it's a plain air review situation. I think it is, to your point, Judge King, an abuse of discretion review.  which, again, clarifies the applicable law, which is it's for the trial judge to decide whether or not a particular police action is legal or not, and it's for the jury to decide whether someone's guilty or innocent. And, you know, for those reasons, Your Honor, we think it was an appropriate instruction. It's not sui generis. Mr. Perpora is right. It's not insensitive. But the Tenth Circuit has a pattern jury instruction of that type. The Sixth Circuit case that we cited, Allen reviewed that particular instruction and deemed it to be an appropriate instruction, and it was certainly appropriate in this case as well. So unless the Court has further questions, thank you for your time. Thank you, Mr. Metcalf. Mr. Perpora? Your Honor, if I may, just briefly, just to pick up, again, on page 179 of the appendix, that's where Mr. Balter did object to the instruction, and he specifically said under the circumstances of this particular case, he objected to the instruction, and the government wanted that particular instruction. And I won't belabor that at all. Judge King, if I may, I think the real issue that you're having with me in this argument Are you saying that at 179 he says the instruction is wrong or just not to give it? He says not to give it. He doesn't say, under the circumstances of this case, do not give this particular instruction. I wish that he could have gone further and expanded on that. Obviously, in retrospect, I can expand on that. The circumstances of that particular case is that the only issue before the jury is the credibility of the police officer to testify. Right. But we're bound by what counsel said at trial, and if he didn't tell the district court that it was an illegal, unlawful, or wrongful instruction, just that he would prefer it not be given, that's a pretty high barrier on abuse of discretion to get over. The way it's articulated is under the circumstances of this case. And I can point you to that. I believe that's what he says. It sticks in my mind. Well, he says, and I think that under those circumstances of the government having made this a prime issue in this case and presented it within its context, I think it's 179 of the appendix. 179? 179, Your Honor. 179. I've got jury instruction number six. Instructions itself. And perhaps I apologize. We're in the middle of the page at line eight. Right. You might be in the supplemental. No, no, no. Please, I believe it is on line eight, as Judge Agee just said, on page 179 of the ‑‑ Oh, I got the wrong appendix. I'm sorry. It's the thick one. I got something called a supplemental appendix. Yes, it's the thick one, Judge. Anyway. Maybe all that other stuff is in here somewhere, too, then. No, and I can answer that question. I see you say under those circumstances. Right, right, right. Okay. And just getting back, the reason what you have in Maryland is a statement of probable cause. That's the arrest basis where you call an arrest warrant. That's what they're given when they make an arrest in Maryland. And in the statement of probable cause, that's what the officer articulates are the observations for the basis. And that's what he's cross‑examined on. It's rare, if never, comes in as evidence. So it's not evidence in a particular case. I know it's not evidence, but it could be helpful to the court in the context of the suppression ruling. I'm not talking about being evidence at the trial. Okay. We're talking about, when we talk about the issue of the Fourth Amendment issue, we're talking about the suppression hearing and that ruling. Right, right, right. And the hearsay rules and evidentiary rules aren't as strict there. Judge King, I apologize. You're absolutely correct. And you're right. I wish we had it now. That's the basis. And I don't know. We're much better when things are over and we look back on what we should have done. But it should have been done in this particular case. And I just, very briefly, I think the only issue which I have with the court is that when he's crossing the street, there's no basis in our opinion, it's at best a hunch that, in fact, he has a gun on him. They never see him do anything. He's not nervous. He doesn't run from the officers. He answers their questions. His actions may be weird and they're taken in context in a high crime area. They called it strange. Strange, strange. They used the word strange. Strange is fine. But that, there's no, again, there's no articulable basis. When he straightens up. It's not a crime to be strange. Excuse me? It's not a crime to be strange. It's not a crime to be strange. Where, was the police report in evidence at the suppression hearing? No. I'm confident it was not in evidence at the suppression hearing. I'm confident it wasn't. I didn't try it, but I'm confident it wasn't. Thank you very much for your time. Mr. Perpola, we thank you and, in particular, we appreciate your court appointed here and we appreciate your service to your client here and as well as in the district court. Thank you. Thank you very much. I appreciate that. We'll come down and pre-counsel and adjourn court until tomorrow morning at 930. This honorable court stands adjourned until tomorrow at 930. Godspeed to the United States and this honorable court.
judges: Robert B. King, G. Steven Agee, Stephanie D. Thacker